IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


KELWIN DEWAYNE ADAMS                                                    PLAINTIFF

                v.                          Civil No. 06-3074

DONALD KOPPENHAVER                                                     DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Kelwin Dewayne Adams brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.  While he was an inmate of the Searcy County Detention Center, Adams contends his constitutional rights were violated when he was subjected to an unreasonable threat of injury or death.  Specifically, he maintains defendant, Donald Koppenhaver, allegedly threatened his safety while holding a shot gun.

An evidentiary hearing was held on December 2, 2008.  At the conclusion of the hearing, the case was taken under advisement pending preparation of this report and recommendation.  Defendant's counsel was also requested to supplement the record by submitting to the court a copy of the defendant's incident report.  The report has been received by the court.  (Doc. 61).

### I.  BACKGROUND

Adams was incarcerated at the Searcy County Detention Center (SCDC) from September 23, 2006, to January 17, 2007.  (Doc. 37) at ¶ 1.[1]  He was a pre-trial detainee.  *Id.* at ¶ 2.  The incident at issue in this case occurred on October 27, 2006.

--------

[1]Adams also indicates he was again incarcerated at the SCDC in May of 2008.  However, the May 2008 incarceration is not relevant to this lawsuit.

-1-

At the hearing, the court heard the testimony of the following witnesses: (1) Jack Freeman; (2) Brian Stockton; (3) Donald Koppenhaver; (4) Donald Lee; (5) Kelwin Adams; and (6) Alvin Dale Bolen. For the purposes of discussion, I will summarize in the first person the testimony of the witnesses given. For ease of presentation, the testimony will not necessarily be presented in the order given at the hearing.

### Jack Freeman

I'm currently incarcerated in the Varner Unit of Arkansas Department of Correction (ADC). I was Adams' cell-mate in the SCDC on October 27, 2006.

I was on lock-down. Four inmates were locked down because Lee and I were raising havoc. The way it went at the SCDC was that if one inmate got locked down all inmates in the cell did. I asked why and was told it was because we were being loud the night before. We had been yelling out jokes late the night before.

The jail administrator at the time was Brian. When we were locked down, Brian was up at the front desk at the time.

I remember that day well. I had guns drawn on me that day by Koppenhaver and Bolen.

The incident happened in the early morning hours. At about shift change, 8:00 a.m., Donnie Lee and I were kicking the door. We covered the security camera with a piece of paper to get the correctional officer back there. We were demanding to be let out of the cell to take a shower. Brian Stockton let all the other inmates out to take a shower but wouldn't let our cell out to take a shower. It was just me and Lee kicking and yelling. With the camera covered, the officers couldn't tell who was doing what.

-2-

Koppenhaver put his shot gun in the bean hole and told us to get down flat on our stomachs.  I used to hunt so I know a shot gun.  Later on is when I found out who was holding the shotgun but I also knew his voice.  When he came in the cell, he was holding the shotgun.

Koppenhaver and Bolen entered the cell.  Bolen had a 45 handgun.  Koppenhaver had a shotgun.

There were two men laying down trying to sleep–laying on their bunks.  One had a mat on the floor.  Lee and I did what he said.  One man was on the floor on a mat.  The other man there was not enough room on the floor for him.  So, he got face down on the mat.

I got on the ground.  I didn't mouth off.  They had a shotgun.  No shots were fired.

Koppenhaver kept going on about my murder charges and that he was going to make sure I got life.  Koppenhaver said "if you guys move I'll would blow your head off."   He was directing the threat at all of us.

Koppenhaver had his gun to Lee's back.  Alvin was holding the 45 on me.  He had it to my head.

There were other inmates in the day-room at the time.  The other inmates were free to move around.  The other inmates could have overtaken the officers.  There was not a door knob or lock on the door at the time.

No one's life was in danger before Koppenhaver and Bolen came back there.  Whenever they came back there with paperwork they carried guns with them.

On October 27th, I observed Adams being handcuffed.  I believe Altman was handcuffed.

The matter was settled.  I was in handcuffs.  We were handcuffed for thirty to forty-five minutes behind a locked cell door.  No charges were brought.

-3-

Bolen had to unlock the door for Adams.  Adams was handcuffed and shackled and under his blanket.  Bolen went in the cell and uncuffed Adams.  I believe he was by himself.  There was no danger.  I was already uncuffed.

I was transferred to Stone County Jail the following Monday morning.  I was there for about two months until December and then brought back to the SCDC.

I filed a lawsuit over this same incident.  *Freeman v. Bolen*, Civil No. 06-3078.  The lawsuit has been dismissed.  *See* (Doc. 21 in Civil No. 06-3078.  Case dismissed without prejudice  following plaintiff's having notified defendants' counsel he did not wish to continue with the case).

Koppenhaver had it out for me.  Koppenhaver and I clashed.  We just couldn't get along.

The treatment at the SCDC was poor.  It was overcrowded and the food was not good.

Adams was locked down when he was released from the SCDC.  Adams was not a major problem at the jail.

I recall Adams stabbing another inmate, Eric Snowden, with a pencil.  I do remember Adams being in a fight with another inmate.  The other inmate was 6'4" and about 300 pounds.  Adams didn't start the fight.  An officer came to the gate and told Adams to stop.

I was convicted of second degree murder.  I'm an amateur kick boxer.  I practiced kick boxing.  I was not paid.

**Brian Stockton**

I was employed at Searcy County Jail in October of 2006.  I'm now an equipment manager in Marshall, Arkansas.

I came in about 7:45 a.m. on October 27, 2006.  I locked Adams and his cell-mates down the day before for a disturbance caused the night before.  I believe I was told everyone in the cell was moving around in the cell and raising cane.

Very seldom when I was there did officers carry weapons around inmates.  There was no rule or policy against an officer carrying a weapon wherever he wanted to in the facility.  There was no written policy barring the officers from carrying firearms anywhere in the facility.  I trust the officers.

Officers often checked their weapons before entering the jail.  There is a small lock box in the dispatcher's area.  The officers rarely go into the cell area.  While I was there, maybe once a week an officer would put his weapon in the lock box and go into the cell area.

The security cameras record to a hard drive.  There are sixteen cameras.  One or two jailers are in the control room watching the monitor in all areas of the jail at the same time.  The monitor shows all sixteen cameras at one time–it is divided into sixteen sections.

The primary purpose of the cameras is so the jailer can see what is going on in the various areas of the jail.  There is no audio just video.

We had trouble with the system.  I don't know when the video system was purchased or installed.  I was never able to get the system to work.  I know I worked on them quite a bit.

The system was advertised to record to a loop that wrote over after four to five hours.  The system was also advertised to be able to write to a DVD, CD, etc., but I was never able to get it to do that.  I was never able to get a single DVD, CD, or tape, made of anything.

I sent the system back at least one time.  One time the company sent a part and I repaired it myself.

-5-

I'm not aware of any rules or regulations regarding camera placement or what they can video. I never got the recording system right. As far as I know, they still can't record from the system. I never hired a repair man to come in and repair it. I had to ship it off. The company didn't have any repairmen around there. The cameras were funded by the county but I don't know where the money came from. I assume the county.

When I got in, I heard reports of what happened the night before. An inmate had no say so in his punishment on lock-down. I often discussed with an inmate why the inmate was being locked down but I took the officer's word on what occurred. When incidents happen, reports are sometimes made. Reports were made regarding the October 27th incident. I responded to grievances. I don't recall if Adams submitted a grievance regarding this incident.

Koppenhaver is an investigator for the Sheriff's Department. This incident happened before I was on duty so it occurred before 7:45 a.m. I didn't do any investigation regarding the incident. Koppenhaver doesn't work for me so I didn't look into it.

I did hear that they went back there with firearms and quelled a disturbance. I didn't ask questions about it. I didn't hear about the threat to shoot. The deputies' office is in the same building as the jail so the deputies are always in and out.

I first heard about the incident from the dispatcher before I got to the jail. The dispatcher said the disturbance had been going on all night and the camera had been covered. The dispatcher said Bolen and Koppenhaver went back and stopped it. I was relieving the dispatcher.

Over the next few days, I heard the inmates' side of the story. Often there was only one person on duty. So the officers did unlock the cells for us occasionally.

-6-

### Donald Koppenhaver

I'm an investigator for the Sheriff's Department. I've been in law enforcement for fifteen years.

I came on shift at 2:30 a.m. on October 27th. I did rounds and got to the jail about 5:30 a.m. or 6:00 a.m.

The disturbance started probably around 7:00 a.m. just after Jailer Chuck released the other inmates that day. I'm not sure on the time. I was watching on the monitor in the dispatch room when he let the inmates out.

After the jailer let the inmates out, he came back up front. The incident occurred at the drunk tank. Freeman and Lee were kicking the door. The disturbance lasted about five to eight minutes before the camera was covered.

Adams was still lying on his bed. He didn't get up to use the bathroom or anything.

Once the camera was covered and we lost sight of the cell, we decided on our own to go back there. It was a freak incident that we were there. The jailer did not ask us for assistance.

Being that there were four inmates in the cell, I went to my patrol car and retrieved the shotgun. It is a twelve gauge pump. I unloaded it in the front seat of my car. I carry five rounds in it at all times. I ejected the rounds and left the breach open.

In 2006 the cartridge on the shells I was using was green. If Lee saw anything red, it was the plug on the end of the reload chamber. It meant there were no shells in the weapon.

If there is a shell in the breach underneath the reloader, you can see the brass part of the shell. You do not see the casing of the shell at all.

-7-

I believe I have the same shotgun now as I had in 2006.  I do not have the shotgun with me today.

Bolen and I discussed unloading our weapons.  It was a situation where the weapons could have been taken from us.

Bolen got his hand gun.  It was a 45.  He didn't keep a bullet chambered.  It is not a good idea with a 45 to keep a bullet chambered.  Bolen dropped his clip at the dispatch desk.  I don't know if the breach on his gun was open.  Neither gun was loaded.

We brought weapons into the jail area.  We stuck the guns in the bean hole.  I said "It's going to not be nice; You sons of the b------ get the f— on the ground."  I told them to get on the ground face down with their hands in front of them.  Through the bean hole I could see Freeman and Lee get on the ground.

When we entered the cell, was Freeman on the right, Adams was lying at the feet of Lee at the right corner, and Altman was laying on a mat at the far right.  I didn't threaten to blow their heads off.  I didn't say anything like I was going to blow someone's head off.

I probably used a few other adjectives, cuss words, telling them not to move, etc.  I did use cuss words.  I was yelling at Adams and telling him not to move.  Adams had a few adjectives to give to me.

In fact, I told Adams several times not to move.  After we entered the cell and I had my back to Adams, he kept turning over and he had some adjectives to give to me.

I began to handcuff Lee.  I was on top of Lee when I handcuffed him.  I laid my shotgun to the right side of Lee.  The only time I pointed it at someone was when I pointed it at the bean hole.

-8-

I handcuffed Adams because he would not comply and be quiet.  I told him at least twice to be quiet.  He was to my back.  He was lying on the floor when I handcuffed him.  He was still talking back when I was handcuffing him.  He was handcuffed for my safety and that of everyone else.

He did not appear to be in fear for his life.  He was still "talking smack" when I handcuffed him.  He was saying:  "Why you doing this?"  "Why don't you leave me alone?" "What the hell is going on?" "Why the hell you doing this?" etc.

Altman was not handcuffed.  He complied completely with everything.  Lee was handcuffed and moved.  Lee was the only one taken out of the cell.

I knew Adams had stabbed someone in the stomach.  I asked Adams at the time if he wanted to file charges.  Freeman was charged with second degree murder.  Altman had held off a SWAT team for over ten hours.  Lee was a two time sex offender.

The whole incident didn't last more than fifteen to twenty minutes.  We took Freeman out of the cell.  Afterwards we returned and I uncuffed Adams.

The camera was covered.  We had no idea what was going on.  We took guns because Adams, Lee, and Freeman had made several allegations about wanting to jump the jailer.  We brought the guns back there to secure the scene.  Nothing was done until the camera was covered and we lost sight of the cell.

We didn't try to just verbally diffuse the situation.  For several weeks, the inmates had been given warnings about tearing the place up.  We didn't go back until the camera was covered. I don't believe we could have came back without weapons.  We diffused the situation and no one got hurt.

-9-

Adams was lying at the rear of the cell at the feet of Lee at the right hand corner when we entered the cell.  He had a blanket over him.  He was awake long before we entered the cell.

Stockton was on shift at 8:00 a.m.  He came on duty not too long after the incident was over.

I wrote an incident report.  The report provides as follows:

On 10/27/06 about 7:45 am there was yelling shouting and banging in the back of the jail.  I went to the dispatch office to look at the camera to the cells.  Donnie Lee and Jack Freeman was banging and yelling this went on for about five minute till Freeman blacked out the camera in the cell 10.  At this time Bolen and myself went to the back of the jail.  I had my shotgun and Bolen had his sidearm.  I put my shotgun in the bean hole and told everybody to get on the floor and put their hands on their heads.  Bolen and myself went into the cell 10 to check on the prisoners and restore order.  There were four inmates in this cell when the door opened myself and Bolen told very body in the cell not to talk or move at this time we started to cuffed Lee and Freeman.  That is when Adams started to roll over and shoot his mouth off so I cuffed Adams.  At no time was any prisoner hit, punched or kicked to put order back in cell 10.  The two inmates Lee and Freeman were separated from each other.  It should also be known that Altman the forth man in the cell didn't do anything wrong he complied to every commanded.

Doc. 61.

### *Donald Lee*

I'm in the Wrightsville Unit of the ADC.  On October 27, 2006, I was in the SCDC locked down in a cell with Adams and Freeman.  We had been locked down for about five days without a shower.  We were demanding to have a shower.

The morning of the 27th all of the other cells had been let off lock-down.  Our cell was the only cell still on lock-down.  All the other cells had been let out.  We started demanding to be let out.  Freeman was kicking the cell door.  He also covered the camera.

-10-

A few minutes after the camera was covered, a shot gun was pointed through the bean hole. We were told to get on the floor on our stomachs. Bolen had a handgun. Koppenhaver had a shotgun.

Koppenhaver pointed a shotgun at Adams and said if he moved he would blow Adams' head off. Bolen told Freeman if he moved that he would blow his head off. There was a little profanity in there.

We weren't talking right then. We feared for our lives. There was a lot of commotion. I didn't hear everything. I focused on the weapons.

I was laid belly down on the floor but I was still looking around. Koppenhaver placed handcuffs on me. I had to put my hands behind my back. He made the threat to Adams before I was cuffed. He made the threat to Adams right when he came in the cell. He put his shot gun in my back.

There is a concrete ledge in the cell. I put my feet up there to get my feet shackled. He let loose of his gun to shackle me. He laid his gun on the ledge beside me. I was laying on my left side. I could see the gun was loaded. I could see a red shell in it. Where you pump it in. Where you load it. If it was pumped, it would be loaded.

Bolen took me to the hallway. Koppenhaver was still in the cell. Everyone was cuffed and shackled. They brought the cuffs and shackles into the cell with the guns.

I was handcuffed behind my back. Bolen tried to pick me up. The handcuffs cut into my back. I have two scars on my back.

There was no life threatening situation. No charges were brought against me as a result of the incident.

-11-

Koppenhaver and I didn't agree very much. We had problems with each other over different things.

I recall Adams getting into a fight with an inmate who weighed 280 pounds. It was three to five minutes before the officers came through the gate. First one officer came back but didn't come through the gate. He just told Adams to break it up.

Adams was on lock-down when he left the SCDC. I was on lock-down when Adams left the jail.

### Kelwin Adams

I'm currently incarcerated in the ADC. I was convicted of the manufacture and delivery of a controlled substance.

On October 10th I was to get extradited to Missouri. Koppenhaver was polite on the way to court. He said I should sign the extradition papers. I didn't sign the papers. I felt his "whole thing" changed after that.

On October 27, 2006, I was woken up by a commotion caused by two inmates questioning an officer outside the cell about why we were not getting off lock-down. I don't believe they got an answer. Jack and Donny were the ones causing the commotion. They started kicking the cell door. Jack covered the camera.

Altman was not doing anything. I was laying wrapped in a blanket on my side just looking at the whole thing. I saw a shotgun coming through the bean hole. I heard Koppenhaver saying "everyone get down on your stomachs, put your hands over your heads, if you move I'll blow your f------ heads off." They came in.

-12-

I was shocked.  I was laying there on my side.  Bolen put his revolver against Freeman's head.  There was so much yelling, I don't remember if Bolen threatened Freeman's life.  But I recall Koppenhaver put his gun up to the small of Lee's back  and said:  "If you move, I'll blow your head f------ head off."

Altman rolled over and said you remember I didn't have nothing to do with this.  Altman was not handcuffed.

Koppenhaver handcuffed and shackled Lee.  To shackle Lee's ankle Koppenhaver had to put his gun down.  Koppenhaver's back was going to be to me.  First he pointed his gun about ten inches from my face and said:  "If you move I'm going to blow your head off."  Then he laid his shotgun down right beside me."

I was looking at the barrel of the gun.  I only saw the barrel of the shotgun.  I just kept my head down.  I was shaking my head.  I'm still shocked.  I'm wasn't getting loud.  I was just saying:  "What's going on."

Koppenhaver shackled Lee's ankles.  They then yanked Lee up.  Lee hurt his back or something.  They took him out in the hallway.  Koppenhaver came back in yelling at Freeman saying why would he do that he was already in so much trouble.

Freeman was handcuffed.  I'm not sure if he was shackled.  I don't think he was.  I don't think the officers were carrying shackles when they entered the cell.

I was still wrapped in my blanket.  Koppenhaver said you are already in so much trouble in Missouri.  I asked why he was talking to me.  I was so angry.  He handcuffed me.  Forty-five minutes later he uncuffed me.

-13-

I didn't cry or soil myself during the incident.  I didn't beg the officers not to shot me because I didn't do anything.

I submitted a grievance about the incident.  *See Complaint* (Doc. 1) at page 5.  In the grievance I included the fact that Koppenhaver said "if you move I will blow your head off."  He didn't cuss at me when he made this statement.

I didn't ask to go to the doctor following the incident.  I didn't need to go to the doctor after the incident.

### *Alvin Dale Bolen*

I'm a deputy sheriff for Searcy County.  I have been a deputy sheriff off and on for fifteen years.  I was a deputy sheriff in October of 2006.

I first became aware of the situation when I was out back.  Koppenhaver approached me and told me there were problems in the jail.  I guess I was out getting my car fueled.  I could hear the commotion even out back.

When the camera got covered, we cleared our weapons and went back.  I have a 1911 Model Colt 45.  I dropped the magazine and checked the chamber.  It was clear.  I didn't see Koppenhaver clear his gun.  But I did see him check the chamber of his gun and it was empty. I don't recall if he moved the slide forward or not.  He had unloaded the gun in his car.

The shotgun is a Model 870 Remington.  If a shell is exposed, what you see is the brass end.  The loader on some of the models has a red plunger on it.

When we went into the cell, I remember there was yelling. There is a window to the cell but you can't see the entire cell from the window without difficulty.  Koppenhaver put the barrel

AO72A
(Rev. 8/82)

of his gun to the bean hole where the inmates could see it and ordered them onto the floor.  The bean hole is a little door on the cell door.  They became compliant.

We then entered the cell.  All four inmates were down on the ground.  I had my gun in my hand and pointed downward.  Altman was to the left, Adams on the far side, Freeman to the far right, and Lee was basically straight in front of the door.

The door to the cell is actually on the left side.  The cell is rather on the small side.  There is a concrete bunk to the right and back.

I moved to my right to take care of Freeman.  Koppenhaver walked straight in. Koppenhaver went to Lee.  We secured them.  Lee was removed from the cell.  When we went down the hall, Lee complained about his back.  There were three or four scratches on his back. I seated him on a bench in the hall by the door.  I then went back in the cell.

I don't recall hearing Koppenhaver saying anything like–"I'll blow your head off."  I was watching the inmates and looking around for weapons.  I'm sure I would have heard it if Koppenhaver had said it but I can't recall much of the conversation.  My thoughts were on security and nothing more.

Handcuffs were applied to Freeman and Lee and later to Adams.  Altman remained quiet and motionless.  He was to the right as I was looking into the cell.

None of the inmates were shackled.  No one was in fear of us shooting.

Adams was talking and moving around.  He was not complying with orders.  If he was overly alarmed, he wouldn't have been mouthing back.  None of the inmates seemed to be in fear.

I had been advised of an incident between Adams and Snowden where a pencil was used. I had also been advised Freeman and Lee planned to lure a jailer back there and attack him.  I

-15-

knew about the charges against the inmates in that cell.  I knew Freeman was in there on a murder charge and I knew about the brutality of the death of the murder victim.

Adams and Freeman remained cuffed for fifteen to twenty minutes.  In my opinion the guns worked.  The two of us were going into a cell with four inmates some of who had violent histories and charges.  I'm not sure we had any mace or pepper spray at the facility we could have used.  I've been involved in incidents where pepper spray has been used in a small jail like that and the whole cell block becomes uninhabitable.

I'm not sure why Lee was taken to Stone County following the incident.  I think maybe both Lee and Freeman were taken.

What we did worked and no one was hurt.  We had two inmates basically inciting a riot and we didn't know what was going on with Adams and Altman.  In Searcy County standards it was a riot.

I didn't do an incident report.  I concurred with Koppenhaver's report.  I read it at the time.  It covered my actions too.  I read it and saw it was correct.

I'm not sure where the incident report goes.  It is reviewed by the Sheriff and then I believe it was filed with the jail incident reports.

I didn't receive a salary as a detention officer.  At that time, I had transport duties and court duties.  It was a common thing to assume duties at the jail when they had violent people there and inexperienced jailers.  There was a concern about weapons in the jail.

The jail was at capacity.  There was only one jailer on duty on the morning in question.  I can't recall if the jailer asked for assistance.  The policy of the Sheriff was when in doubt don't have the jailer enter the cell block.  Jailers are basically defenseless.

-16-

I don't know if we could have waited.  There were loud noises, yelling, and screaming.  I can't recall what words were used or even if I knew at the time.  Gaining control of an out of control situation is a priority with us.  Once the camera was covered, the quicker we got in there the better.

## II.  DISCUSSION

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.   The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).   Prison conditions claims include threats to an inmate's health and safety.  *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

Adams maintains his rights were violated when Koppenhaver brought a shotgun into the cell and threatened to blow his head off if he moved.   To establish a violation of the Eighth Amendment, Adams must prove both an objective and subjective element.  *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct.

-17-

2321, 115 L. Ed. 2d 271 (1991)).  He must prove that:  (1) Koppenhaver's conduct "objectively r[o]se to the level of a constitutional violation by depriving [him] of the minimal civilized measure of life's necessities[; and (2) Koppenhaver's conduct also reflects] a subjective state of mind evincing deliberate indifference to [Adams] health or safety"  *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.).

Although in general "[v]erbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985), the Eighth Circuit has made an exception "when the state official engaged in a 'brutal' and 'wanton act of cruelty' even though no physical harm was suffered." *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008).

In *Burton v. Livingston*, 791 F.2d 97, 99-100 (8th Cir. 1986), the officer pointed a gun at Burton's head and told him to run so the officer would have an excuse to shoot him. *Id.* at 99.  The Eighth Circuit held that Burton had stated a claim of constitutional dimension. *Id.*  It held that "a prisoner retains at least the right to be free from the terror of instant and unexpected death at the whim of his custodians." *Id.* at 100.

-18-

In *Irving*, the correctional officers beginning in November of 2004 and ending in September of 2005 were overheard on multiple occasions saying they would kill Irving or have him killed or attacked if he did not drop the lawsuit. Additionally, one of the officers repeatedly told other inmates that Irving was a snitch in an effort to incite an assault against Irving. The court noted the correctional officers "themselves were a large part of the 'conditions posing a substantial risk of serious harm' to Irving." *Id.* at 447. The Eighth Circuit concluded in *Irving* that when "viewed in light of their retaliatory nature, their objectively credible basis, and their fear-inducing result, the death threats allegedly made by [the guard] form the basis of an injury sufficiently serious to implicate the Eighth Amendment." *Irving*, 519 F.3d at 449.

We believe Adams has failed to establish Koppenhaver's conduct violated the Eighth Amendment. First, we do not believe Adams has established by a preponderance of the evidence that Koppenhaver threatened to blow Adams' head off. The evidence presented at the hearing was contradictory in this regard. Freeman testified Koppenhaver did make a threat but it was a general threat made at all inmates in the cell. Freeman's testimony was detailed regarding the day in question and the threat made by Koppenhaver.

Lee and Adams testified a specific threat was made towards Adams. Koppenhaver testified no such threat was made towards Adams or any inmate. Bolen testified he did not hear Koppenhaver made any such threat and if such a threat had been make Bolen believes he would have heard it.

Second, even if we assume a threat was made by Koppenhaver, there is no evidence that Adams believed that he was in danger and his testimony did not in anyway indicate he was in

-19-

"terror of instant and unexpected death at the whim of his custodians." *Burton*, 791 F.2d at 99-100.  Instead, he testified he was angry and could not believe it was happening.  He did not remain quiet at the order of the officers instead questioning why they were talking to him, handcuffing him, etc.  These actions do not suggest Adams was in fear of his life or believed he was in danger at the time of the incident.

Third, there is no evidence to suggest Koppenhaver's weapon was loaded on October 27, 2006.  In fact, all evidence suggests that the weapon had in fact been unloaded before Koppenhaver entered the cell area.

Fourth, there was a disturbance at the jail and the security camera had been covered.  All inmates assigned to the cell in question had known violent histories and/or were incarcerated on serious criminal charges.  Koppenhaver and Bolen could not determine without entering the cell whether all inmates in the cell were themselves safe.

Given the facts that certain inmates in the cell had threatened to lure jailers back to the cell and homemade weapons are frequently found in the cell, it would not be improper for Koppenhaver to take some type of protection with him to the cell block.  In short, Koppenhaver's conduct did not deprive Adams of the minimal civilized measure of life's necessities or evidence deliberate indifference to Adams' health or safety.

### III.  CONCLUSION

I therefore recommend that judgment be entered in favor of defendant Donald Koppenhaver and the complaint be dismissed with prejudice.

AO72A
(Rev. 8/82)

The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 22nd day of December 2008.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)